Argued July 19, reversed and remanded September 17, 1918.

## HUME *v.* MEARS.

(174 Pac. 1156.)

Contracts—Construction—Duty of Court.

1. Under Section 136, L. O. L., providing that the court shall determine the construction of statutes and other writings, the court must construe the written contracts made the basis of plaintiff's complaint.

Patents—Assignment of Invention or Right to Patent.          ·

2. In view of international convention of March 20, 1883, as modified by supplementary treaty concluded at Brussels December 14, 1900, and ratified by the United States August 25, 1902 (32 Stat. 1936), where defendants, having acquired some rights under the United States patent laws, at least by application for patents, filed application for patent in Great Britain, defendants' English rights, even before issuance of patent in Great Britain, constituted a property right which was the legitimate subject of contract and sale.

Brokers—Right to Commission—Sale of Property—Contract.          ·

3. In an action by a broker for his commission for sale of patent rights for which application was pending in Great Britain, the broker could not recover commission on proof of securing purchasers not willing to buy assignments of mere application rights, but insisting that they all first go to patent.

[As to what services by a broker entitle him to a commission, see note in 28 Am. St. Rep. 546.]

From Multnomah : ROBERT G. MORROW, Judge.

Department 1.

The plaintiff sues to recover damages for the breach by the United States Cashier Company and Thomas Bilyeu of a contract which the plaintiff alleges bound them to pay him a commission for finding a purchaser for certain British patent rights of which they claimed to be the owners. He claims as the assignee of a cause of action arising out of the contract made by the company and Bilyeu with one Goodbody and also for a breach of an agreement supplementary thereto made with the plaintiff himself. These contracts are set out as exhibits to the complaint and their execution is

admitted. Otherwise, that pleading is denied. After a jury trial there was a verdict and judgment for the plaintiff, from which the defendants appeal, the receiver of the company having been substituted as defendant in its stead.      REVERSED AND REMANDED.

For appellants there was a brief over the names of *Messrs. Cake & Cake* and *Mr. Robert J. Upton,* with oral arguments by *Mr. H. M. Cake* and *Mr. Upton.*

For respondent there was a brief over the name of *Messrs. Clark, Skulason & Clark,* with an oral argument by *Mr. A. J. Skulason.*

BURNETT, J.—On September 25, 1912, the Cashier Company and Bilyeu as parties of the first part made the written agreement with Arthur E. Goodbody whereby they granted to the latter ''the full right and privilege of selling and disposing of the English patent rights owned by them in the machine known as the Cashier Machine and the machines which have been developed therefrom by the said Cashier Company or which may hereafter be developed therefrom,'' in the kingdom of Great Britain and Ireland. It was stipulated therein that ''the price which the said Cashier Company and the said Bilyeu shall receive for the assignment of their patent rights covering said machines in Great Britain shall be the sum of fifteen thousand pounds sterling, and to be paid in cash in hand at the time of the delivery of the assignments of said patent rights by the parties of the first part.'' In addition to this, 20 per cent of the patent rights was reserved by the company, together with 20 per cent of the stock of any company which might be formed to take over the rights. The contract further provided that Goodbody should receive ''as his full commission

and compensation for negotiating the sale of said patent rights a 10 per cent commission upon the purchase price hereinbefore mentioned to be paid in cash.'' After other stipulations not now important, the contract proceeds thus:

''When the said sale is completed and the payment is made as hereinbefore agreed, assignments shall be delivered to the purchasers which will assign and convey to such purchasers the British rights covering all of the applications which have been made by said Bilyeu or by him in conjunction with other parties, covering said machines in the United States and particularly the application for patent which the said Bilyeu has already filed in said Great Britain. Assignments shall be delivered by the said Cashier Company covering the British rights for all improvements, modifications and additions to said machines which have been developed by said Cashier Company and for which patent application has been or may hereafter be made by said Cashier Company in the United States.''

Provision was also made for furnishing one United States Commercial and Payroll Machine, a model of the machine adapting it to British coinage, and blueprints covering the design, mechanism and construction of the different machines, and the company and Bilyeu promised to render friendly aid to the party of the second part in the negotiations for the sale of said patent rights, and to co-operate with him in furnishing data and information concerning their rights in the United States. Later, on August 18, 1913, the company and Bilyeu as parties of the first part, and the plaintiff here in his own proper person as party of the second part, made a written agreement of that date authorizing the plaintiff to go to England and aid Goodbody in ''consummating a sale * * upon the terms in the Goodbody contract hereinbefore referred

to." The plaintiff claims that he and Goodbody performed all the terms of their several contracts and in each instance assigns a breach by the defendants, as follows:

"That notwithstanding the premises and the performance by the plaintiff upon his part of the conditions of said contracts the defendants refused, neglected and failed to perform the conditions thereof upon their part to be performed by refusing, neglecting and failing to sell or assign, or in any manner transfer to the said purchasers the said British patent rights, or any part thereof, although requested so to do by the plaintiff and the said purchasers, by reason of which refusal and neglect upon the part of the defendants the sale thereof failed of consummation."

The plaintiff claims that by reason of the breach thus assigned he is damaged in the loss of his commission, for himself the sum of $14,000 and for Goodbody the sum of $7,500.

1. Section 136, L. O. L., reads thus:

"All questions of law, including the admissibility of testimony, the facts preliminary to such admission, and the construction of statutes and other writings, and other rules of evidence, are to be decided by the court, and all discussions of law addressed to it; and whenever the knowledge of the court is by this code made evidence of a fact, the court is to declare such knowledge to the jury, who are bound to accept it as conclusive."

It was therefore the duty of the Circuit Court at the trial, and it is required of this court in considering the case, to construe the written contracts which the plaintiff makes the basis of his complaint: *Oregon-Wash. R. & N. Co.* v. *Coolidge,* 59 Or. 5 (116 Pac. 93); *Chadwick* v. *Oregon-Wash. R. & N. Co.,* 74 Or. 19 (144 Pac. 1165); *Dahlstrom* v. *Hudelson,* 80 Or. 520 (157 Pac. 798).

2. The evidence shows this situation at the time the Goodbody contract was made, on September 25, 1912: Having acquired some rights under the patent laws in the United States, at least by application for patents here, the defendant Bilyeu filed an application for a patent in Great Britain July 10, 1912. At the time of making the Goodbody contract this was the only British right either of the defendants had. It may be stated in passing that the evidence shows the above-named British application was accepted April 12, 1913, and the patent granted in pursuance thereof was sealed July 10, 1913. In December, 1912, the defendants filed in England two other applications for patents covering improvements on the original machines described in the application of July 10, 1912. No patent was granted on the December application.

It is said in *Richardson Shoe Machinery Co.* v. *Essex Machine Co.,* 207 Mass. 219, 222 (93 N. E. 650):

"The inventor or his assignee has before the issuance or allowance of a patent an inchoate right of property in his invention and in a pending application for a patent, which he may assign or with which he may deal as with an article of property."

See, also, *Cammeyer* v. *Newton,* 94 U. S. 225 (24 L. Ed. 72); *Hammond* v. *Mason & Hamlin Organ Co.,* 92 U. S. 724 (23 L. Ed. 767); *Hendrie* v. *Sayles,* 98 U. S. 546 (25 L. Ed. 176); *Dalzell* v. *Dueber Watch Case Mfg. Co.,* 149 U. S. 315 (37 L. Ed. 749, 13 Sup. Ct. Rep. 886). By the international convention of March 20, 1883, as modified by the supplementary treaty concluded at Brussels December 14, 1900, and ratified by the United States by the proclamation of the President August 25, 1902, to which the kingdom of Great Britain was a party as well as the United States of America, it is provided in Article IV that:

"Anyone who shall have regularly deposited an application for a patent of invention, or an industrial model, or design * * in one of the contracting States, shall enjoy for the purpose of making the deposit in the other States and under the reserve of the rights of third parties, a right of priority during the periods hereinafter mentioned,"

which periods are prescribed to be twelve months for patents of invention: 7 Fed. Stats. Ann. 875.

It is plain under these authorities that the defendants even at the time of making the Goodbody agreement had a property right which was the legitimate subject of contract and sale. Further, the patent of July 10, 1913, having been issued in England, as shown by the testimony, at the time of making the contract directly with the plaintiff, and application having been filed in December of the year previous, in Great Britain, the defendants had still further property which was available for transfer.

3. The plaintiff and his assignor obligated themselves not merely to find a purchaser but to effect a sale. This is written large throughout the contract. Without dispute, the testimony shows that they were well advised of what the defendants had for sale. It is explicitly stated in both contracts what the defendants were to do, which was to make assignments to be delivered to the purchasers, conveying to them "the British rights covering all of the applications which have been made by said Bilyeu or by him in conjunction with other parties * * particularly the application for patent which the said Bilyeu has already filed in said Great Britain." Out of the mouth of the plaintiff himself it appears that he aided Goodbody in securing the attention of some men of reputed wealth in London but, like most conservative capitalists, they refused to buy the rights which were grounded only on appli-

cations and they insisted that they would not embark in the venture until all the applications, including those of December, 1912, had gone to patent.

It appears that the December applications were supposed to conflict with a previous application said to cover the same invention in some particulars. At any rate, for some reason or other, at the time the plaintiff demanded his commission the patent had not yet been issued on the December application. If the plaintiff would recover on the contract, he must show that he carried negotiations so far that the proposed purchasers had accepted the assignments of British rights covering the applications as stated in the contract. The plaintiff's own testimony shows, as stated, that the capitalists with whom he negotiated in London were not willing to accept such assignments, but insisted upon sealed patents, which as to the December applications had not yet been granted. The plaintiff failed to show that he had effected such a sale as would be covered by the assignments the defendants had covenanted to make. In substance, the defendants offered for sale all the rights they had in Great Britain, part of which rested in applications for patents and not in issued or sealed patents. The application rights were legitimate subjects of sale and were recognized as such by the terms of the contracts. The proposal of the defendants embodied in their agreements and what they bound themselves to do by the excerpt from the contract already set out was to assign the British rights covering these applications. If the plaintiff would recover for effecting a sale, or obtain damages for defendants' breach of contract, he must show that the parties to whom he sold irrevocably accepted the offer of defendants precisely as made. Indisputably, however, the evidence discloses that the possible pur-

chasers were not willing to buy mere application rights but insisted that they all first go to patent. They could accept the assignments covering applications as proposed by the defendants, or not, as they chose, and hence there was no sale effected. The contracts do not bind the defendants to obtain patents. The case is one where the brokers failed to sell what the defendants had for sale.

The question of failure of proof was raised by a motion for a nonsuit at the close of plaintiff's testimony. The plaintiff resisted this and the court overruled it. At the end of all the testimony the defendants renewed the objection to plaintiff's case by a motion to direct a verdict in their favor, which was also denied. The court was in error in both instances. The judgment must therefore be reversed and the cause remanded with directions to enter a judgment for the defendants.          REVERSED AND REMANDED.

MCBRIDE, C. J., and BENSON and HARRIS, JJ., concur.