Argued and submitted October 9, 1997, judgment reversed in part; otherwise affirmed April 1, 1998

# RESCUE TECHNOLOGY, INC.,
an Oregon corporation,
*Respondent,*

*v.*

# CLAW, INC.,
an Arizona corporation,
and Claw, Inc.,
a Washington corporation,
*Appellants,*

*and*

John DOE
and Jane Doe,
*Defendants.*

(9602-01609; CA A95351)

956 P2d 1010

Terrance D. Hannan argued the cause for appellants. With him on the brief was Blair, Schaefer, Hutchison & Wolfe, L.L.P.

Jacob Tanzer argued the cause and filed the brief for respondent.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

.

## WARREN, P. J.

Defendants Claw, Inc., an Arizona corporation (Claw Arizona) and Claw, Inc., a Washington corporation (Claw Washington)[1] appeal from a judgment declaring that Bruno Vogelsanger is the owner of all rights to an invention, that Vogelsanger and plaintiff, as Vogelsanger's optionee, are entitled to possession of the invention and all rights to it and that defendants and those claiming under them have no right to the invention but must surrender all related documents and data to Vogelsanger. The sole issue on appeal is whether the trial court had personal jurisdiction over these defendants. We affirm as to Claw Washington and reverse as to Claw Arizona.

■ We take the facts from the pleadings and affidavits, resolving any factual conflicts in favor of the trial court's determination that it had jurisdiction. *See Sutherland v. Brennan*, 131 Or App 25, 28-29, 883 P2d 1318 (1994), *aff'd on other grounds* 321 Or 520, 901 P2d 240 (1995). Claw Arizona began business in Prescott, Arizona, with the purpose of inventing a portable tool that emergency agencies could use to cut through crashed vehicles in order to rescue their occupants. The goal was to create a tool that was less cumbersome and more mobile than those that already existed. In December 1993, Claw Arizona moved its operations to Buellton, California. Around the same time it parted company with the original inventor. In 1994, Claw Arizona hired Vogelsanger to replace the original inventor; later that year Chris Bernal became his assistant. It thereafter allowed its corporate charter to expire; it was administratively dissolved in October 1994. The business continued to operate in the same fashion after the dissolution as before.

In February 1995, the business moved to Kelso, Washington. Jack Stephens, the president and promoter of both Claw Arizona and Claw Washington, told Vogelsanger that the purpose for the move was to locate in a state that both had little or no corporate income tax and was near a large metropolitan area where the business could obtain the

---

[1] We refer to the two corporations collectively as "defendants."

materials and equipment that were necessary for its work. Washington had the desired tax rate, but Stephens believed that Seattle was not an appropriate location. A location in Washington near Portland was the other possibility. Stephens decided on Kelso rather than Vancouver, Washington, primarily because he was able to rent a house that he liked in Kelso.

In July 1995, Stephens created a new corporation, Claw Washington, giving stock in it to at least some of the investors in Claw Arizona, which he described as defunct. Vogelsanger became a stockholder, director, and officer of Claw Washington. Stephens, Vogelsanger, and Bernal were the only people who worked for the business in Washington. Vogelsanger and Bernal worked on building a prototype of the tool that they had invented; Stephens' role was to deal with existing investors and to attempt to raise more money. In the period immediately after the move to Kelso, one of the three traveled to Portland at least once every two weeks. As time passed the frequency of the trips increased, so that by fall 1995 it could be as often as five times a week. Most of the trips involved obtaining materials, supplies, and services for the prototype; the business purchased about 90 percent of those items in Oregon. It had accounts with a number of Oregon companies for those purchases and leased most of its equipment from other Oregon companies. Its few purchases in Washington were minor in comparison.

Claw Washington purchased medical insurance for Vogelsanger and Bernal through a Portland insurer, hired Portland attorneys to provide legal advice concerning securities issues and to meet with potential investors, and sought financing from a number of Portland area venture capitalists. By fall 1995, the Kelso location had become a burden on the business due to all of the activities in Oregon.

Claw Washington fired Vogelsanger and Bernal in January 1996; its shop in Kelso was closed in February 1996 for failure to pay the rent. Some investors took the equipment in the shop to Arizona; one investor took the prototype, the computer, and the software to an unknown location. So far as the record shows, Claw Washington has not engaged in any business since then. On February 13, 1996, Vogelsanger and

Bernal gave plaintiff, an Oregon corporation, a four-year option to their rights in the invention, negotiating and entering into the option agreement in Portland.

In March 1996, plaintiff filed this action in order to quiet title to the invention from any claims by either Claw corporation; plaintiff intends to exercise its option if the litigation is successful. The trial court denied defendants' motion to dismiss the case for lack of personal jurisdiction over them. After a trial at which defendants failed to appear, the court entered the judgment from which they appeal. Their only assignment of error attacks the denial of their motion to dismiss for lack of jurisdiction.

■ As the party seeking to invoke the trial court's jurisdiction, plaintiff had the burden to come forward with facts sufficient to establish jurisdiction. *State ex rel Sweere v. Crookham*, 289 Or 3, 7, 609 P2d 361 (1980). Plaintiff asserts that it has presented facts that are sufficient to give the trial court jurisdiction of both defendants on three separate grounds. We will begin by discussing each of the grounds on which plaintiff relies as they affect jurisdiction over Claw Washington. We will then discuss whether there is jurisdiction over Claw Arizona.

■ We first consider ORCP 4 A(4), which provides for jurisdiction

"[i]n any action, whether arising within or without this state, against a defendant who *when the action is commenced*:

"* * * * *

"A(4) Is engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise[.]" (Emphasis supplied.)

This rule provides for general jurisdiction rather than jurisdiction that is limited to claims arising from the defendant's actions in the state. It grants jurisdiction over claims that arise anywhere in the world. The traditional justification for general jurisdiction on this ground is the theory that the defendant, by engaging in the activities that it describes, either impliedly consents to jurisdiction or is present in the state so that it may be subject to jurisdiction without consent.

*See State ex rel Circus Circus Reno, Inc. v. Pope*, 317 Or 151, 154, 854 P2d 461 (1993). Thus, jurisdiction under this rule requires that the defendant be engaging in the described activity *at the commencement of the lawsuit*. Otherwise, the defendant is neither "present" nor consenting. Claw Washington ceased doing business, in Oregon and elsewhere, no later than February 1996, but plaintiff did not file this action until March. Claw Washington could not have been subject to general jurisdiction in Oregon under ORCP 4 A(4) at the commencement of this case.

■ Plaintiff also argues that Oregon has *in rem* jurisdiction under ORCP 5 A, which provides that there is jurisdiction

> "[w]hen the subject of the action is real or personal property in this state and the defendant has or claims a lien or interest, actual or contingent, therein, or the relief demanded consists wholly or partially in excluding the defendant from any interest or lien therein."

Plaintiff argues that ownership of an invention is intangible personal property and that, because Vogelsanger and Bernal offered it for sale in Oregon and an Oregon corporation purchased an option in Oregon, the invention is itself present in Oregon. For support it also relies on *Restatement (Second), Conflict of Laws* § 65 (1971), which states:

> "A state has power to exercise judicial jurisdiction to affect interests in an intangible thing which is not embodied in a document if the relationship of the state to the thing and to the parties involved makes the exercise of such jurisdiction reasonable."

The Supreme Court has held that an inventor has an inchoate right of property in an invention before the issuance of a patent, *Hume v. Mears*, 89 Or 519, 523-24, 174 P 1156 (1918), and it has held in a number of cases, beginning with *Johnson v. Oregon City*, 2 Or 327, 330 (1868), that the location of intangible property is that of the person of the owner.[2] For the following reasons, those rules do not assist plaintiff.

---

[2] *Johnson v. Oregon City*, 2 Or 327, 330 (1868), and similar cases involve the location of intangible personal property for purposes of taxation. We do not need to decide if the rules that they establish are limited to that context.

First, there is no evidence that either Vogelsanger or Bernal is an Oregon resident, and thus there is no evidence that the invention is located in Oregon even under plaintiff's theory. Attempting to sell it in Oregon, or granting an option in this state to purchase it, is insufficient to give it an Oregon location if the owners reside elsewhere. Secondly, as plaintiff recognizes, since *Shaffer v. Heitner*, 433 US 186, 97 S Ct 2569, 53 L Ed 2d 683 (1977), the United States Supreme Court has made the exercise of *in rem* jurisdiction subject to the minimum contacts test of *International Shoe Co. v. Washington*, 326 US 310, 66 S Ct 154, 90 L Ed 95 (1945), that previously applied solely to *in personam* jurisdiction. *Restatement* § 65 recognizes a similar requirement when it provides that the relationship of the state to the property and to the parties must be such as to make the exercise of jurisdiction reasonable. Thus, even if the invention were clearly located in Oregon, we would still need to consider the nature of the relationship between Claw Washington and this state. We turn to that issue.

■■ Plaintiff finally relies on ORCP 4 L, which provides for jurisdiction "in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States." Because the Oregon Constitution does not contain a due process clause, the effect of this rule is to extend jurisdiction to the limits of due process under the Fourteenth Amendment. The controlling authority, therefore, is the United States Supreme Court. *See State ex rel Circus Circus Reno*, 317 Or at 156. The Oregon Supreme Court has summarized that court's cases as establishing a two-part test for long-arm jurisdiction.

> "First, the defendant must have 'minimum contacts' with the forum state. 'Minimum contacts' will be found where the defendant has 'purposefully directed' its activities at residents of the forum state *and* where the litigation 'arises out of or relates to' those activities. * * * Second, even if minimum contacts exist, the exercise of jurisdiction must be reasonable; in the light of various factors deemed relevant by the Court, the exercise of jurisdiction must comport with 'fair play and substantial justice.' " *Id.* at 159-60. (Emphasis in original; citation deleted.)

■ ■ Determining whether a defendant's actions in the forum state constitute the required minimum contacts necessarily involves an examination of the specific case, and fact-matching can do no more than provide guidance. The parties have not directed us to any case with facts that are directly comparable to those in this case. We have examined the cases that the parties have discussed and hold that Claw Washington's actions constitute minimum contacts with Oregon. We do so essentially for the reasons that plaintiff stated in its brief:

> "Claw Washington's business in Oregon was not only substantial, but systematic. It was located adjacent to the Oregon market so that it could participate in the Oregon market. It did so by purchasing virtually all of its equipment, materials, supplies and services in Oregon, using Oregon counsel to attempt to raise money in Oregon and [offering the invention for sale] in Oregon. Its employees traveled regularly across the river on business to avail itself of the resources of the Oregon market. Claw Washington * * * actively engaged in business relationships and transactions in Oregon. Despite its physical location across the river, Claw Washington was by its own business strategy a regular and systematic participant in the Oregon market."

The purposes for Claw Washington's business activities in Oregon were the construction of a prototype of the invention and raising money for and selling the invention. This litigation arises out of or relates to those activities. We see nothing that makes it unreasonable for Oregon to exercise jurisdiction over Claw Washington in these circumstances.

■ Jurisdiction over Claw Arizona is a different issue. That corporation was administratively dissolved before the business moved to Washington. Defendants argue that, as a result, it is impossible to treat Claw Arizona as having been involved in anything that happened in Washington, as it no longer existed. Plaintiff points out that, under Arizona law, the dissolution does not necessarily mean that Claw Arizona was unable to conduct any business thereafter. Ariz Rev Stat § 10-1421 B provides that an administratively dissolved corporation continues to exist but may not carry on any business "except that necessary to wind up and liquidate its business

and affairs * * *." Claw Arizona's continued limited existence, however, does not help plaintiff.

The business that Stephen operated after the dissolution of Claw Arizona was not limited to winding up activities, such as the allocation of assets, the disposition of property, the discharge of liabilities, and the distribution of assets to stockholders. *See United Bank of Arizona v. Sun Valley Door*, 149 Ariz 64, 716 P2d 433, 437 (App 1986). Rather, the business was actively engaged in developing and marketing a product, pending the formation of a new corporation. After its dissolution, the Arizona corporation had no authority to engage in those activities, and there is no evidence that, from October 1994 until July 1995, the business was anything other than a proprietorship of Stephens' that was ultimately incorporated into Claw Washington.

The legal consequence of these conclusions is that Claw Arizona never left California and was never present in Washington. Thus, all of the activity that subjects Claw Washington to Oregon jurisdiction has no relationship to Claw Arizona. Because Claw Arizona never had any contract with Oregon, ORCP 4 L does not make it subject to Oregon jurisdiction on plaintiff's claim. The trial court erred in concluding otherwise.

Judgment against Claw Arizona reversed; otherwise affirmed.